Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner as follows:
 *************
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the alleged injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At such time, an employment relationship existed between plaintiff and defendant-employer.
3. Liberty Mutual is the carrier on the risk.
4. Plaintiff became separated from employment on or about May 15, 1996, and has been paid temporary total disability benefits up to and including the date on which he became separated from employment.
5. Plaintiff's compensation rate is $172.51.
6. Plaintiff has been rated as retaining a 40% permanent partial impairment to his right arm by Richard Goldner, M.D.
7. Medical records marked as stipulated exhibit 1 were received into evidence.
8. A set of employment records marked as stipulated exhibit 2 were received into evidence.
 *************
Based upon all of the competent evidence from the record herein, the Full Commission adopts the findings of fact by the Deputy Commissioner with minor modifications as follows:
 FINDINGS OF FACT
1. At the time of the hearing, plaintiff was a thirty-seven year old male who had obtained a high school degree and had completed some college coursework. Plaintiff's prior work history had included serving six years in the United States Marine Corps.
2. During September of 1993, plaintiff was hired by the defendant-employer, a temporary services agency, and placed in a job position with Black and Decker. Plaintiff worked for Black and Decker as a tumble operator. One of the policies that the defendant-employer expected of its employees was the requirement that anytime that a worker was unable to report for work for one of its clients, that worker was to notify the defendant-employer in advance. Another policy that the defendant-employer expected its employees to follow was a requirement that an employee was to only use the after-hours answering service for emergency situations or in the event that the worker could not return to an assignment the next morning.
3. On March 21, 1994, plaintiff went to assist a co-worker who needed help repairing her machine. Another co-worker called out for the plaintiff, and when he turned his head toward that worker, the first co-worker released a gearing press down on plaintiff's right index finger, resulting in its fracture.
4. The parties entered into an approved Form 21 Agreement whereby the defendants agreed to pay the plaintiff temporary total disability compensation at a rate of $172.51 per week for "necessary weeks."
5. Between March 21, 1994 and March 4, 1996 plaintiff underwent three surgical operations. The first operation resulted in the amputation of plaintiff's right index finger. The other two operations involved unsuccessful attempts to relocate some nerves in plaintiff's hand in order to reduce the pain in his hand.
6. Plaintiff was released by his treating physician, Dr. Goldner, to return to full time work on March 4, 1996 within the following restrictions: plaintiff was restricted to not lifting more than twenty pounds; not doing any activities that required him to pinch between his thumb and index finger greater than one pound; and not working in an environment that had a temperature below 65 degrees.
7. On March 26, 1996, plaintiff returned to work with the defendant-employer at a job assignment with BCH. BCH had a stated policy that employees who miss three days of work during a three month period are subject to termination. Plaintiff's job duties required him to work in an open-door building separating the contents of garbage that had been collected. Plaintiff's shift began at 11:00 p.m. at night and ended at 7:00 a.m. in the morning. The doors to the building where plaintiff worked remained open in order to allow the odor of the garbage to dissipate.
8. According to the stipulated "contact log," two days after plaintiff returned to work, Kathy Mik, a supervisor with the defendant-employer, sought a basis to terminate plaintiff without having continuing liability under the Workers' Compensation Act. Ms. Mik made inquiry to the carrier as to whether the defendant-employer would be liable for workers' compensation benefits if the plaintiff was laid off by the defendant-employer.
9. On April 3, 1996, plaintiff notified Kathy Mik that he was unable to work on April 3, 1996 because his hand was aching and throbbing.
10. During the two months that plaintiff worked with BCH, Keith Pittman, the defendant-employer's site supervisor, harrassed the plaintiff because of the physical restrictions that had been placed on plaintiff.
11. On May 9, 1995, plaintiff reported the problems that he had with Keith Pittman to Bobbie Combs, another supervisor with the defendant-employer, who offered to immediately pull him off the assignment. Plaintiff refused to quit until the defendant-employer found him another job assignment. Plaintiff reasonably believed that if he quit his job with BCH his workers' compensation benefits would not be reinstated. Ms. Combs informed plaintiff that she could not locate him another job assignment until he quit his assignment with BCH.
12. Also on May 9, 1995, Keith Pittman contacted Kelly Erickson with the defendant-employer and requested that plaintiff be drug tested. Mr. Pittman also reported to Kelly Erickson that plaintiff had missed work several times during the prior month. In the contact log, Ms. Erickson expressed excitement about the possibility of having grounds to terminate the plaintiff. She first considered that plaintiff could be terminated for BCH's policy by exceeding the number of absences allowed and secondly, because plaintiff had not reported his absences to the main office of the defendant-employer prior to not reporting for work.
13. On May 13, 1996, plaintiff's drug test that was administered pursuant to Keith Pittman's earlier request came back negative.
14. On May 14, 1996, Kathy Mik terminated plaintiff because of his failure to report for work with BCH on April 25, 1996, May 5, 1996 and May 10, 1996. A termination report completed by Kathy Mik on May 14, 1996 did not indicate that plaintiff was terminated because of his failure to call the defendant-employer about his absences. The blank beside the infraction, "absent with no call to Mega Force," was left unchecked. On June 19, 1996, plaintiff was notified that he had been terminated.
15. The defendant-carrier unilaterally terminated plaintiff's temporary total disability benefits when he returned to work at BCH and did not reinstate these benefits when the defendant-employer terminated the plaintiff on May 14, 1996.
16. The job with BCH was not a suitable job offer within his restrictions because it required plaintiff to work in a location with a temperature below 65 degrees.
17. Plaintiff's absences from work were a result of the pain he was experiencing in his hand due to working for the defendant-employer in temperatures below 65 degrees. Plaintiff's testimony that this pain was so great that he was unable to work on the days that he missed at BCH during April and May of 1996 was found credible by the Deputy Commissioner and therefore is found credible by the Full Commission. Plaintiff's pain was a direct and natural result of the March 21, 1994 compensable injury by accident. The defendant-employer's decision to terminate the plaintiff because of the three absences was related to his compensable injury.
18. Plaintiff complied with the defendant-employer's notification policy when he informed Keith Pittman, the site supervisor for the defendant-employer at BCH, that he was going to be absent in advance of the time that he was scheduled to work at BCH. Defendant-employer's assertion that plaintiff was expected to leave a message on the answering machine was inconsistent with its own policy and was merely a pretext to justify terminating plaintiff's workers' compensation benefits.
19. The defendant-employer did not terminate Silas Dobbins and James Pitt, two other workers who had missed three or more workdays during a three month period while employed with BCH during April and May of 1996.
20. Plaintiff attempted to locate work at over seventy different locations and sought the assistance of a vocational counselor in an effort to find work. Plaintiff conducted a reasonable but unsuccessful job search.
21. As of September 17, 1996, plaintiff reached maximum medical improvement with regard to his compensable right hand injury.
22. As a result of the March 21, 1994 compensable injury by accident, plaintiff sustained a forty percent permanent partial disability to his right arm.
23. The defense of this claim has been based upon stubborn, unfounded litigiousness.
 *************
Based on the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The defendants have failed to show by the greater weight of the evidence that plaintiff was no longer disabled beginning March 26, 1996. The defendants have failed to show by the greater weight of the evidence that the job position with BCH was a suitable job offer. The defendants have failed to show by the greater weight of the evidence that there are any suitable jobs in the competitive marketplace that plaintiff could obtain if he diligently sought such employment. Kennedy v. Duke Univ. Med.Center, 101 N.C. App. 24, 398 S.E.2d 677(1990).
2. Even if it is assumed arguendo that the defendants offered plaintiff suitable employment at BCH, the defendants have failed to show by the greater weight of the evidence that plaintiff's termination was for fault unrelated to the compensable injury, and that a nondisabled employee would ordinarily have been terminated. Seagraves v. Austin Co. of Greensboro, 123 N.C. App. 228,472 S.E.2d 397(1996).
3. Plaintiff is entitled to receive total disability compensation at a rate of $172.51 per week beginning March 26, 1996 up to the present and continuing, until further order of the Industrial Commission, subject to a credit for wages earned at BCH. N.C. Gen. Stat. § 97-29.
4. Plaintiff's return to work with BCH did not in and of itself rebut the presumption of continuing disability. Plaintiff did not waive his right to a hearing to determine whether the job with BCH was an offer of suitable employment. The parties did not enter into a Form 26 agreement approved by the Industrial Commission as to whether plaintiff could return to work and at what wage. An employee's presumption of disability may not be defeated merely by a return to work. Kisiah v. W.R. KisiahPlumbing, 124 N.C. App. 72, 476 S.E.2d 434(1996) Defendants were obligated to reinstate and continue to pay plaintiff's temporary total disability compensation until the Industrial Commission authorized suspension or termination of such benefits after providing both parties a hearing on this matter. "`Absent a settlement with the employee, an award of [permanent partial] disability cannot be undone without resort to a lawful determination by the Commission that the employee's disability no longer exists — which will require the application of law to fact and, therefore, a hearing.'" Saums v. Raleigh CommunityHospital, 346 N.C. 760, 763, 487 S.E.2d 746(1997), citingKisiah, supra, 124 N.C. App. at 80, 476 S.E.2d at 438. The Commission takes judicial notice that a Form 24 informal hearing did not take place in this matter prior to the defendants' unilateral discontinuance of plaintiff's ongoing temporary total disability benefits. The defendants' decision to unilaterally discontinue plaintiff's ongoing temporary total disability compensation has resulted in stubborn, unfounded litigiousness. N.C. Gen. Stat. § 97-88.1.
5. Plaintiff is entitled to have defendants provide all medical treatment arising from the compensable injury by accident. N.C. Gen. Stat. § 97-25.
 *************
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay the plaintiff total disability compensation at a rate of $172.51 per week beginning March 26, 1996 to the present and continuing, until further order of the Industrial Commission, subject to a credit for any wages paid.The portion of this amount that has accrued shall be paid in a lump sum directly to the plaintiff.
2. Defendants shall pay attorney's fees to plaintiff's counsel, Terry Kilbride, in an amount equal to twenty-five percent of the amount awarded to the plaintiff in paragraph 1. Thereafter, defendants shall pay $172.51 every four weeks directly to Mr. Kilbride until further order of the Industrial Commission. The payment of the attorney's fees shall not be deducted from the award of benefits to the plaintiff.
3. Defendants shall pay all medical expenses incurred by plaintiff as a result of the compensable injury by accident, when bills have been submitted to the Industrial Commission pursuant to approved Commission procedure.
4. Defendants shall pay the costs.
This the ___ day of September 1998.
 S/ ________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/ ______________________ THOMAS J. BOLCH COMMISSIONER
S/ ______________________ RENÉE RIGGSBEE COMMISSIONER