The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Wanda Blanche Taylor and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award. Accordingly, the Full Commission affirms and adopts, with modifications, the Opinion and Award of the Deputy Commissioner.
***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and are subject to and bound by the provisions of the Workers Compensation Act. The Commission has jurisdiction of the parties and of the subject matter, and an employer-employee relationship existed between plaintiff and defendant at all relevant times.
2. All parties have been correctly designated, and there are no questions as to misjoinder or nonjoinder of parties.
3. Defendant was self insured, and there are no questions as to insurance coverage of the parties.
4. Plaintiffs average weekly wage is $627.49, yielding a compensation rate of $418.35.
5. Plaintiff suffered a compensable injury by accident to her back and left knee on August 18, 1997 as a result of a slip and fall while she was working in the employment of defendant.
6. The parties stipulated into evidence as Stipulated Exhibit 1, without need for further authentication or verification, a packet of documents including plaintiffs medical records, Industrial Commission forms and Defendants Answers to Plaintiffs First Set of Interrogatories and Request for Production of Documents.
***********
Defendant filed a Form 60, Employers Admission of Employees Right to Compensation, dated April 21, 1998, admitting plaintiffs right to compensation for an injury to her left knee at a compensation rate of $418.35. Defendant filed a Form 60, Employers Admission of Employees Right to Compensation, on January 21, 1999, admitting plaintiffs right to compensation for injury to her left knee and back at a compensation rate of $418.35 per week.
***********
Based upon all the competent evidence of record and the reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was 55 years old, having been born May 6, 1943. Plaintiff had completed high school and obtained degrees as an LPN and as an LRN. Plaintiff had been employed at UNC Memorial Hospital for approximately ten years and two months before retiring on December 31, 1994. Plaintiffs entire career as an operating room technician, LPN and LRN had all been in the operating room; when she retired from UNC Memorial she retired as a supervisor in the operating room.
2. In February 1995, plaintiff became employed with Durham Regional Hospital, defendant, as a staff nurse in the operating room. The duties were similar to those plaintiff performed during her career at UNC Memorial. Plaintiffs duties consisted of preparing the room for operation, participating in the operation, preparing patients for operation, transporting patients, scrubbing, assisting in anesthesia and other duties. The physical requirements of plaintiffs job required her to move patients, equipment and supplies as well as to clean and mop rooms. Plaintiff worked eight-hour shifts but often worked longer into the night, at times 24 hours, depending upon the available staffing and the procedure being performed. Plaintiffs job required that she be on her feet almost constantly.
3. Plaintiff initially worked full time with defendant, but after approximately one year, due to personal preference, decreased her hours to four days and then to three days one week and four days the next week. Plaintiff was working this schedule on August 18, 1997.
4. In March 1995, plaintiff had returned, at the request of her former supervisor, to a part-time desk job at UNC Memorial Hospital reviewing payroll reports for accuracy. This job came about because her previous supervisor there called her and asked her to help them out by doing payroll auditing for the department. In that job, she would review the employees pay reports to make sure that they were correct. She was a pencil pusher. Plaintiff worked at this job twelve to fifteen hours per two-week period from March 1995 through May 2, 1998. Plaintiff was at liberty to set her own hours at the UNC Memorial position.
5. On August 18, 1997, plaintiff suffered an admittedly compensable injury by accident when she slipped and fell in the dressing area of the operating room while working for defendant. Plaintiff was wearing new shoe covers, which slipped out from under her, and she hit the floor, the wall and a bench, injuring her back and left knee.
6. Defendant sent plaintiff to Dr. David Dellaero, an orthopedic surgeon, for treatment. On October 16, 1997, plaintiff underwent an arthroscopic partial menisectomy for a meniscus tear, which was performed by Dr. Dellaero. On December 10, 1997, plaintiff presented to Dr. Dellaero with complaints of back pain and was referred by him to Dr. Wilson, a physical medicine and rehabilitation specialist, who prescribed physical therapy and pain management at Southwind Spine Rehab Center.
7. Plaintiff was released to return to light duty with restrictions on April 15, 1998 by Dr. Dellaero. Plaintiff was instructed to return to work to a sedentary position with defendant, and she did so on April 20, 1998. The job was a modified job that was two hours a day for five days a week. Plaintiff was instructed to begin work at 8 a.m. daily and was not allowed to set her own hours. Plaintiffs modified position was a data entry position. She tried this job for thirty days at two hours per day. Her back and knee were giving her difficulty as she tried to work and the muscle spasms in her back were unbearable. Due to the pain medication making her drowsy, she was unable to take any medication for her condition during work.
8. The modified Durham Regional job was a data entry position that was different from her part-time UNC work because of the set hours and the daily requirement. At her UNC job, she was able to set her own hours, sometimes allowing seven or eight days between working. At UNC, she would work mostly on weekends when fewer people were there. At UNC, if the pain was unbearable one day, she would wait until she was having a better day to go to work. The modified Durham Regional job did not allow that freedom, so the pain got to such a point that she could no longer deal with it.
9. On August 14, 1998, Dr. Dellaero found plaintiff to be at maximum medical improvement and was of the opinion that plaintiff retained a 15% impairment to her left knee and a 5% impairment to her back and was not a candidate for back or knee surgery.
10. Plaintiff experienced continued back and knee pain as she attempted her return to work with defendant. Plaintiff began having severe muscle spasms in her back, but due to her pain medication making her drowsy, was unable to take any medication for her condition during her return to work.
11. At the end of thirty days of going to work at Durham Regional and dealing with the pain, she had an appointment with her primary care physician, Dr. Coleman. At that time, her knee was still bothering her, but her back problem was the worst. Upon learning of the pain she was in, Dr. Coleman took her out of work and referred her to pain management at Duke. At this point, Ms. Sanders got into a disagreement with Cathy Whisenhunt as to whether or not Durham Regional was going to pay for her back treatment.
12. Plaintiff then saw Dr. Khilstrom, whom she had originally seen at Southwind. After testing, he treated her back with epidural injections that were effective for about three weeks. He then felt that her knee and resulting gait problems were causing her to have problems with her back, so she was referred to Dr. Dahners for a second opinion on her knee. At that time, she still could not walk properly and was in a lot of pain. Dr. Coleman was monitoring this treatment. Durham Regional refused to pay for this second opinion. Since June 3, 1998, Durham Regional had not paid for any treatment for Ms. Sanders, except for their second opinion by Dr. Koeleveld.
13. During all of this treatment, Ms. Sanders treating physicians were advising her to remain out of work. She kept Durham Regional aware of this fact. In November 1998, Dr. Dahners had to perform surgery on Ms. Sanders left knee. At the time of the hearing before the Deputy Commissioner, she was still healing from the surgery. She was not scheduled for any more back treatment until the knee was treated. As of the date of the hearing, she was still having knee pain and her back pain was sometimes unbearable, depending on her physical activity. She was still under her doctors care and had been advised not to return to work. Dr. Coleman advised her to seek permanent disability. Other than some small, reduced workers compensation she received in the summer of 1998, Ms. Sanders had not received any other workers compensation benefits since her attempted return to work in the spring of 1998.
14. During this period plaintiff was aware of defendants position that Dr. Dellaero was her authorized treating physician and that it would not pay for treatment by Dr. Dahners. The defendant called Cathy Whisenhunt as a witness. Ms. Whisenhunt, prior to November 30, 1998, was in charge of and handled the workers compensation program for Durham Regional Hospital. She personally handled Florine Sanders claim. She indicated that she was aware of the knee injury when it occurred and then later became aware of the back injury in December of 1997. She also acknowledged that she had the opportunity to review medical records in this matter that made mention of the back injury as early as August 26, 1997.
15. In the fall of 1998, Ms. Whisenhunt learned that Ms. Sanders had worked part-time at UNC Hospital. Thereafter, she never discussed the same with Ms. Sanders, nor did she inform the long term disability company (MetLife) at that time that Ms. Sanders had worked this part-time job. However, the day prior to the hearing before the Deputy Commissioner, Ms. Whisenhunt contacted MetLife and told them about the part-time work at UNC. She learned that MetLife knew about the part-time work at UNC and that it made no difference to them.
16. On November 30, 1998, Dr. Dahners performed surgery on plaintiffs left knee. At the time of the hearing before the deputy commissioner, plaintiff was still healing from that surgery. Plaintiff was not scheduled for further back treatment until the knee had been treated.
17. At the time of the hearing before the deputy commissioner, plaintiff continued to have knee pain and severe back pain based upon her activity. Plaintiff remained under her doctors care and had been advised not to return to work.
18. During plaintiffs treatment, plaintiffs treating physicians were advising her to remain out of work, and plaintiff kept defendant apprised of this fact. Plaintiff is unable to return to her pre-injury job of operating room nurse, and no other suitable job has been identified for her. In most long-term disability claims, Ms. Whisenhunt is not the middle person who handles the forms between the claimant and MetLife. In this particular claim, however, she did handle all of the paperwork. As such, she was aware of all of the out-of-work notes for Florine Sanders, as she was given them all. During this whole process, Ms. Whisenhunt did not dispute that Dr. Coleman had taken Ms. Sanders out of work, nor did she advise MetLife that they should look into the fact that Dr. Coleman took her out of work. However, Ms. Whisenhunt did forward Dr. Colemans notes to MetLife and requested that they pay disability benefits based on Dr. Colemans determination.
19. Plaintiff has not received workers compensation benefits since her attempted return to work on April 20, 1998. Ms. Whisenhunt has had no medical training yet she had the decision-making authority regarding which claims are paid and which medical treatment was authorized for Durham Regionals workers compensation claims. She was also the person responsible for filing the correct forms with the Industrial Commission. She was aware of the time limits set by the law regarding properly accepting or denying claims.
20. Plaintiff received long-term disability; however, that benefit was reduced by plaintiffs workers compensation benefit. After deduction for workers compensation benefits paid to plaintiff, her first disability check was reduced from $13,410.31 to $3,201.90. Plaintiff has not been paid any long-term disability since June 22, 1998.
21. Although plaintiffs authorized treating physician referred plaintiff to Dr. Wilson, a physical medicine and rehabilitation specialist, as early as December 10, 1997, as of July 20, 1998, defendant had not accepted the back claim. After July 20, 1998, defendant denied authorization for any medical treatment and second opinions relating to this claim. A FCE that Dr. Dellaero, plaintiffs authorized treating physician, had requested for plaintiff was also denied.
22. The two-hour per day modified job offered to plaintiff by defendant in April 1998 was not offered to anyone other than employees on workers compensation, was not a listed position available to the public, was not a position for which defendant would have hired someone "off the street and was a job that was generally performed by other nurses as a part of their position. As such, the job offered to plaintiff was not a real job available in the competitive marketplace and was not suitable employment.
23. Plaintiff was unable to perform the job at a modified position which was offered to her by defendant in that she was physically incapable because of pain caused by her admittedly compensable left knee and back conditions to regularly perform the job on a set schedule on a daily basis.
24. As a direct and proximate result of her admittedly compensable injury by accident and the resulting knee and back condition, plaintiff was unable to engage in physical activities required by her former job or any other job available in the marketplace from August 18, 1997 and continuing except for the 30 day period in which she unsuccessfully attempted a trial return to work on April 20, 1998.
25. At no point was plaintiff released to return to work without restrictions.
26. All treatment sought by plaintiff and rendered to her for her back and left knee conditions since August 18, 1997 was medically necessary and reasonably design to effect a cure, give relief or lessen her period of disability.
27. The evidence in this case is undisputed: Plaintiff cannot return to her pre-injury job of an operating room nurse. No other suitable jobs have been identified for plaintiff. In fact, defendant has terminated vocational services for the plaintiff. Dr. Dellaero indicated on May 14, 1998, that plaintiff was totally disabled, only to change his opinion the next day after Cathy Whisenhunt coerced him. He made this about face without even re-examining Plaintiff. Dr. Coleman, the doctor who has been treating plaintiff the longest and who has been coordinating her treatment for her back and her knee, has stated that she is totally disabled and has written the same in his notes or on disability notes on many occasions. Cathy Whisenhunt, acting as defendants agent, has not disputed Dr. Colemans assessment of disability. In fact she has sought to use his determinations to get MetLife to pay disability benefits. She is more than willing to accept his determination if another entity is paying the claim, but she refuses to accept Dr. Colemans disability determination for workers compensation purposes solely because he was not "authorized. Merely because a physician is not a treating physician authorized by the employer does not make that physicians medical opinion worthless, especially when the physician is in a position to know the facts and offers convincing and compelling testimony.
28. Plaintiff continues to be in the healing period and has not yet reached maximum medical improvement.
***********
Based upon the foregoing stipulations and findings, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On August 18, 1997, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course and scope of her employment when she slipped and fell while performing her job duties with defendant. N.C. Gen. Stat. 97-2(6).
2. Plaintiff earned an average weekly wage of $627.49, yielding a compensation rate of $418.35.
3. As a result of her compensable injury, since August 18, 1997, plaintiff has been incapable of earning the same wages that she was earning at the time of her compensable injury by accident with the exception of a 30-day period beginning April 20, 1998 when she worked part time. Plaintiff has been disabled since her compensable injury because she lost wage-earning capacity and, therefore, is entitled to compensation. N.C. Gen. Stat. 97-29.
4. The well-established case law controlling in this matter is that "once a Form 21 agreement, establishing the disability, is entered into by the parties and approved by the Commission, a presumption of disability attaches in favor of the employee. Watkins v. Central MotorLines, Inc., 279 N.C. 132, 181 S.E.2d 588 (1971). This presumption continues until the employee returns to work at wages equal to those he was receiving at the time of his injury. Id. Because of this presumption, the burden then shifts to the employer to show that the plaintiff is employable. Dalton v. Anvil Knitwear, 119 N.C. App. 275,458 S.E.2d 251, disc. rev. denied and cert. denied, 341 N.C. 647,462 S.E.2d 507 (1995). This presumption has been held to apply to Forms 60 as well. The Form 60 and defendants subsequent payment of workers compensation benefits constitute an Award of the Commission with respect to compensability and liability for the injury by accident. The employers execution of Industrial Commission Form 60 constitutes an award of the Commission and thus entitles the employee to seek the imposition of a judgment, which in turn entitles him to seek execution for past due installments and future installments as they become due. Calhoun v. Wayne Dennis Heating Air Conditioning, 129 N.C. App. 794, 501 S.E.2d 346
(1998).
5. Plaintiff has met her burden of showing that she is not able to earn wages as a result of her compensable injuries. Defendant has not met its burden of showing that plaintiff in this matter is employable. To rebut the presumption of disability, defendant must show, not only that suitable jobs are available, but also that the plaintiff is capable of getting one, taking into account both physical and vocational limitations. Kennedy v. Duke Univ. Med. Ctr., 101 N.C. App. 24,398 S.E.2d 677 (1990). Defendant has only shown that it offered a "make-work job to plaintiff. Such a "make-work job is not suitable employment.
6. Because the offered job was not suitable employment, in essence, defendant asks the Commission to find that a release to return to work with restrictions by a doctor meets the defendants burden of showing "not only that suitable jobs are available, but also that that plaintiff is capable of getting one, taking into account both physical and vocational limitations, Saums v. Raleigh Community Hospital, 346 N.C. 760,487 S.E.2d at 746 (1997). The argument that a doctors release to return to work with restrictions alone overcomes the presumption of disability in effect asks the Commission to find that employment is presumed to be available and offered to the injured employee. Such a presumption flies in the face of the Courts decision in Saums, which held that employers may not attempt to avoid their obligation to pay benefits by simply creating "made-work jobs which do not truly reflect the claimants wage-earning capacity. See 346 N.C. at 765, 487 S.E. 24 at 750.
7. For her temporary total disability, plaintiff is entitled to temporary total disability compensation at the rate of $418.35 per week from August 18, 1997 and continuing. However, defendant is entitled to a credit for all amounts previously paid under the Workers Compensation Act. N.C. Gen. Stat. 97-29.
8. The two hour per day job offered to plaintiff by defendant was make-work, did not represent her true wage-earning capacity and was not suitable employment. Plaintiff was justified in refusing such position. Saums v. Raleigh Community Hospital, 346 N.C. 760 (1997); N.C. Gen. Stat. 97-32.
9. Defendant may not deny a claim and then attempt to direct medical treatment. In denied claims (or constructively denied claims where an injury has been neither admitted nor denied), a plaintiff is free to pursue and direct her own medical treatment. If the claim is later found to be compensable, as in this case, defendant is responsible for all reasonably necessary treatment, regardless of whether it directed or authorized the treatment while the claim was in a denied (or not accepted) status.
10. Plaintiff is entitled to all medical treatment resulting from her August 18, 1997 compensable injuries to the extent that such treatment is designed to effect a cure, give relief or lessen her period of disability. N.C. Gen. Stat. 97-25.
***********
Based on the foregoing stipulations, findings of fact and conclusions of law, the Full Commission makes the following:
 AWARD
1. For plaintiffs compensable injury by accident, defendant shall pay temporary total disability compensation to plaintiff at the rate of $418.35 per week for the period from August 18, 1997 and continuing until further order of the Commission. This amount shall be subject to a credit for all amounts previously paid by defendant to plaintiff under the Workers Compensation Act. Portions of this compensation are due and shall be paid in a lump sum; thereafter, such amount shall be paid in a weekly payment. All such compensation shall be subject to a reasonable attorneys fee approved in Paragraph 2.
2. A reasonable attorneys fee of 25% of the compensation due under Paragraph 1 of this Award is approved for plaintiffs counsel and shall be paid by defendant by deducting from that sum and paid directly to plaintiffs counsel.
3. Defendant shall pay all medical expenses incurred by plaintiff as a result of her compensable injury by accident.
4. Defendant shall bear the costs, including deposition fees previously approved for Dr. Dahners, Dr. Dellaero, Dr. Wilson and Mr. Mark Anderson. Furthermore, defendant is ORDERED to pay an expert witness fee, which is HEREBY APPROVED, in the amount of $175.00 to Dr. Arnett Coleman for his deposition testimony taken on June 23, 1999.
This 29th day of November 2000.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/_______________ LAURA K. MAVRETIC COMMISSIONER
S/_______________ CHRISTOPHER SCOTT COMMISSIONER